**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

JAMES BAKER, et al.,

        Plaintiffs,

v.                              Case No. 14-10784

OFFICER RANDALL SCHWARB, et al.,

        Defendants.

_____/

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Out on the forested frontier, it was commonplace—and never worrisome—to see buckskin-wearing men setting off toting their flintlocks and hunting knives, fixin' to bring home vittles for the family.  But, in the contemporary reality of a settled, peaceful suburban environment, where most of the hunting is done between aisle three and the frozen food section, the sight of commandos with AK-47s marching along the highway predictably grabs the attention of citizens and law enforcement alike.

      Around 6:00 p.m. on Thursday July 18, 2013, a flood of 911 calls from concerned citizens reached the City of Sterling Heights Police Department, and it dispatched officers to investigate reports of what looked like two young, heavily armed men walking on a city street.  Indeed, when officers arrived on scene near the Henry Ford Medical Center, they encountered Plaintiffs James Baker and Shyama Nixon, one of them dressed all in black and sporting sunglasses, and both carrying impressive looking rifles and handguns in full view.  The officers approached and, after an initial discussion, peacefully disarmed the men.  They were then briefly detained, their I.D.s were retrieved and verified, and they were questioned.  After establishing that the firearms

were lawfully possessed, the officers returned Plaintiffs' weapons and released them. The entire encounter lasted about twenty minutes.

About six months after the incident, Plaintiffs Baker and Nixon sued the City of Sterling Heights, its police department, Chief of Police Michael Reese, Sergeant Jeffrey Bonner, and City of Sterling Heights police officers Randall Schwarb, Thomas Phillips, and Todd Langenderfer.  The court dismissed Plaintiffs' state-law claims, leaving Plaintiffs with their 42 U.S.C. § 1983 claims alleging violation of the First, Second, and Fourth Amendments.  Plaintiffs have since filed an amended complaint that reflects the court's dismissal of their state-law claims and omits the City of Sterling Heights, its police department, and the city's chief of police, as Defendants.  The remaining Defendants—Sergeant Bonner, Officer Schwarb, Officer Phillips, and Officer Langderfer—now move for summary judgment on Plaintiffs' federal claims.  The matter is fully briefed, and no hearing is needed.  *See* E.D. Mich. LR 7.1(f)(2).  For the following reasons, Defendants' motion for summary judgment will be granted.

## I.  BACKGROUND[1]

Plaintiffs Baker and Nixon were walking on a public sidewalk on 15 Mile Road in Sterling Heights, Michigan while carrying pistols in holsters and long guns slung over

---

[1] At a May 22, 2014 scheduling conference, the court learned that the parties collectively possessed at least three videotaped recordings of the events (or part of the events)—one from Baker's sunglasses camera, one from Nixon's cell phone camera, and one or more from the officers' in-car cameras—giving rise to this suit.  Thus, the parties agreed that the essential facts were unlikely to be in dispute and agreed that the court should resolve Defendants' anticipated motion for summary judgment before issuing a scheduling order.  Although the parties respective briefs emphasize different facts, the court concludes that the material facts are not disputed.

2

their shoulders.  After receiving several 911 calls [2] from concerned citizens, the City of Sterling Heights Police Department dispatched Officer Schwarb to investigate.  By this time, Plaintiffs had walked past a public park and a hospital.

After arriving at the scene near the Henry Ford Medical Center, Officer Schwarb directed Baker to place his weapons—a handgun and an AK-47 rifle, hanging by a "speed sling"—on the ground.  Baker initially refused but informed Officer Schwarb that he would not touch his weapons.  Officer Schwarb approached Baker with his firearm pointed towards the ground and asked Baker what he was doing.  Baker responded that he was "walking."  Next, Officer Schwarb directed Baker to turn around and place his hands on his head.  When Officer Schwarb disarmed and handcuffed Baker, Baker stated, "I do not consent to a seizure of my property."

While Officer Schwarb engaged Baker, Nixon backed away and recorded the encounter on his cell phone.  When Officer Phillips arrived at the scene he approached Nixon from behind and told Nixon to place his hands on his head.  Nixon complied and his cell phone fell to the ground.  In similar fashion to Baker, Nixon stated that he did not consent to a search of his property.  Officer Phillips secured Nixon's weapons—a rifle and a handgun—and handcuffed him.  Although Officer Phillips looked in Nixon's pocket, he did not find any identification and consequently radioed dispatch to check the registration on Nixon's handgun.

---

[2] According to Defendants, the City of Sterling Heights Police Department received nine emergency calls.  (Dkt. # 16, Pg. ID 104.)  Apparently, the City of Troy also received emergency calls because on their walk, Plaintiffs briefly entered Troy.  (*Id.*) According to Plaintiffs, the Sterling Heights Police Department had received six calls when Officer Schwarb arrived on the scene.  (Dkt. # 20-1, Pg. ID 197.)

3

With both Baker and Nixon safely restrained, Officers Schwarb and Phillips continued asking questions.  Baker stated that he and Nixon were "exercising [their] constitutional rights."  Further, Baker inquired if he was being detained, to which Officer Schwarb replied that Baker was not under arrest.[3]  Next, as Baker protested, Officer Schwarb located Baker's wallet and took out Baker's identification.  Before invoking his right to remain silent, Nixon stated, "I do not consent to any searches of my property" and "I'm not breaking any laws, I'm just exercising my First Amendment rights or my Second Amendment rights."  During this time, Officers Schwarb and Phillips verified that Plaintiffs were over the age of 18, did not have any criminal convictions or outstanding personal protection orders against them, and were properly licensed to carry their weapons.  Approximately ten minutes after the officers placed Nixon and Baker in handcuffs, the pair were un-handcuffed and the officers returned their weapons. Sergeant Bonner, who had arrived after Baker and Nixon had been un-handcuffed, informed Plaintiffs that they were free to go because they were legally carrying their weapons.  Baker refused to "[pick] up his gun up in front of police officers, [because] that's asking to get shot."  Sergeant Bonner responded that he would "not deal in absurdities," and the officers entered their vehicles and departed.[4]

Baker and Nixon later posted an edited version of their videos on YouTube.com. Thereafter, on February 20, 2014, they filed this suit.  Defendants Sergeant Bonner,

_____

[3] When Baker asked, "[a]re we committing a crime?" Officer Schwarb responded with "[t]hat's what we're trying to figure out" because "you're freaking out half the city here."

[4] Although Officer Langenderfer also came to the scene and taped the encounter on his dashcam, it appears that he had no interaction with Plaintiffs.

4

Officer Schwarb, Officer Phillips, and Officer Langderfer now move for summary judgment on Plaintiffs' § 1983 claims for violation of the First, Second, and Fourth Amendments.

## II.  STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial."  *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment—the disputed factual issue must be material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

5

### III.  DISCUSSION

Defendants contend that they are entitled to qualified immunity and thus may not be held liable for damages under § 1983.  Qualified immunity shields government officials from civil liability when actions performed in their official capacity "[do] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity attaches unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The court employs a two-step inquiry in determining whether a government official is entitled to qualified immunity:  (1) whether the official's conduct violated a constitutional right when considering the facts in a light most favorable to the injured party; and (2) whether the constitutional right was "clearly established."  *Id.* at 201.  The determination of whether the right is "clearly established" must be made "in light of the specific context of the case, not as a broad general proposition."  *Id.*

Deciding whether government officials are entitled to qualified immunity "is purely a question of law for the district court."  *Poe v. Haydon*, 853 F.2d 418, 424 (6th Cir. 1988).  "An answer of 'yes' to both of the qualified immunity questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity.  *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011).  Further, although the defendant must initially raise the defense of qualified immunity, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity."  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

6

### A.  Fourth Amendment

The precise nature of Plaintiffs' argument under the Fourth Amendment is difficult to discern from the complaint.  In response to Defendants' motion for summary judgment, Plaintiffs characterize their argument as three distinct Fourth Amendment violations.  Specifically, that Defendants did not:  (1) have probable cause to search Plaintiffs, (2) "have reasonable articulable suspicion to detain and secure Plaintiffs and to perform an investigatory stop," (Dkt. # 20-1, Pg. ID 207) and (3) use the least intrusive means in conducting an investigatory stop.  For clarity, the court will address Plaintiffs' second and third arguments together.

### 1.  Probable Cause to Search Plaintiffs

The Fourth Amendment to the United States Constitution establishes the "right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth Amendment protection against unreasonable searches and seizures generally requires a law enforcement officer to have probable cause to believe that a crime has been or is being committed before conducting a search.  *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009).  Thus, "only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause."  *United States v. Trujillo*, 376 F.3d 593, 603 (6th Cir. 2004) (quoting *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991)).  The existence of probable cause must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citations and internal quotation marks omitted).

From the complaint, it appears that Plaintiffs are contesting the search of Plaintiffs' persons for "wallets, keys, and other items of personal property [taken] from the Plaintiffs' pockets."  (Dkt. # 15, Pg. ID 92.)  Defendants had probable cause to search Plaintiffs because they had reasonable grounds to suspect that Plaintiffs had committed, or were committing, several misdemeanors.  First, a reasonable officer in Defendants' position would have had a basis to believe that Plaintiffs were in violation of M.C.L. 750.234f, which provides that "an individual less than 18 years of age shall not possess a firearm in public except under the direct supervision of an individual 18 years of age or older."  One 911 call described Plaintiffs as "two teenage guys walking with rifles."  Also, Officer Phillips was unable to find any identification on Nixon's person to determine his age.  *See Combs v. City of Birmingham*, 12-14528, 2013 WL 4670699, at *14 (E.D. Mich. Aug. 30, 2013).  Plaintiffs note that Officer Schwarb did not specifically mention Plaintiffs' age in his case summary report but that does not negate his in-the-moment reasonable belief that Plaintiffs may have been under the age of 18.  After determining that Plaintiffs were over the age of 18, the officers promptly returned their property.  Defendants had probable cause to search Plaintiffs for identification based on their youthful appearances pursuant to M.C.L. 750.234f.

Additionally, officers in the position of Defendants reasonably could have believed that Plaintiffs were in violation of at least two city ordinances:  disturbing the public peace (Sterling Heights, MI., Ordinance 35-16) and loitering generally (Sterling Heights, MI., Ordinance 35-17).  Disturbing the public peace consists of causing a "public disturbance," *i.e.*, "any act or series of actions causing an interruption of the public peace and quiet; . . . [including] the direct endangerment of the safety of persons

8

or property."  Sterling Heights, MI., Ordinance 35-19(M).  By Plaintiffs' own terms, they were "walking while open carrying their firearms in local communities . . . [to] desensitize the public to open carry, and to educate police officers with [sic] whom they may encounter on the legality of open carry." (Dkt # 20-1, Pg. ID 196.)  It is reasonably clear that Plaintiffs knew that, in the face of their intended behavior, the public was likely to be highly sensitive (else why seek to "de-sensitize" people?).  The single reasonable conclusion is that Plaintiffs were knowingly acting in a provocative manner, hoping to foment an interaction and cause a disturbance.  As events show, they succeeded nicely.

Officer Schwarb responded to the 911 calls of several concerned citizens, and arrived outside of the Henry Ford Medical Center.  There he saw the two young men both armed with long guns and holstered handguns in view.  For example, this is how Baker looked:



In addition to having reasonable cause to believe that Plaintiffs were causing a "public disturbance," Officer Schwarb had reasonable cause to believe that Plaintiffs were "[loitering] in a place, at a time or in a manner not usual for law-abiding individuals,

9

under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity" in violation of Sterling Heights, MI., Ordinance 35-17(A).  Baker's all-black garb and ominous rifle with a 30-round magazine, coupled with his proximity to an institution—a hospital—was sufficiently unusual for a law-abiding citizen to warrant a degree of alarm for the safety of people nearby.[5]  The officers had probable cause to search Plaintiffs because they reasonably believed that Plaintiffs were disturbing the public peace and loitering generally.

Plaintiffs' counter-argument that in light of M.C.L. § 123.1102, "the city [of Sterling Heights] cannot enforce any ordinance that would pertain to or regulate the transportation or possession of pistols or other firearms," (Dkt. # 20, Pg. ID 214), is unconvincing.  The statute provides:

> A local unit of government shall not impose special taxation on, enact or enforce any ordinance or regulation pertaining to, or regulate in any other manner the ownership, registration, purchase, sale, transfer, transportation, or possession of pistols or other firearms, ammunition for pistols or other firearms, or components of pistols or other firearms, except as otherwise provided by federal law or a law of this state.

M.C.L. § 123.1102.  The court has not found any cases interpreting the interplay between the right to openly carry firearms provided by the state government and a local public disturbance or loitering ordinance.  Yet field preemption is not logically implicated. The ordinances at issue concern public disturbances and loitering, respectively, and do

---

[5] The all-black motif associated with nationally notorious firearm mayhem is well enough known in the pubic record for the court to at least note it in passing:  "Classmates describe the [Columbine, Colorado High School] shooting suspects as part of a clique of generally quiet, brooding students with penchants for dark trench coats, all-black clothes and shaved heads."  http:// extras. denverpost. com/news/shot0420e.htm (last visited August 13, 2014) (URL contains spaces).

not seek to regulate the purchase, sale, transfer, transportation, or possession of firearms.  *See Yenson v. United States Dep't of Treasury*, No. 98–70262 (E.D. Mich. Jan. 26, 1999).

Finally, even in the absence of probable cause, Defendants still prevail. "[P]robable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness."  *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993).  "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [the Supreme Court has] indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  Behavior similar to Plaintiffs' in Michigan's Upper Peninsula would scarcely deserve a second look, especially during wild game season.  But here, Plaintiffs were plainly trolling for a confrontation, and displayed their firearms in a way that was extraordinary for the neighborhood.  The Defendant officers' conduct was, at the very least, reasonable—they were investigating a fear-provoking scenario, and their actions were prudent given the unusual nature of the circumstances.

## 2.  The Investigatory Stop

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that a police officer can stop and question an individual for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest.  Because the Fourth Amendment to the United States Constitution bars "unreasonable searches and seizures," an officer "must be able to point to specific and articulable facts, which, taken

11

together with rational inferences from those facts," *id.* at 27, give rise to a "reasonable suspicion" that criminal activity is taking place. *Id.* at 30. "The officer must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999) (quoting *Terry*, 392 U.S. at 27.) The court views "the evidence in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement." *United States v. Clay*, 181 F. App'x 542, 544 (6th Cir. 2006) (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)). In finding reasonable suspicion, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Arvizu*, 534 U.S. 266, 275–77 (2002). Specifically, there are two factors that are considered: "(1) whether there was a proper basis for the stop, . . . and, if there was a proper basis for the stop, (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand." *O'Malley v. City of Flint*, 652 F.3d 662, 670 (6th Cir. 2011) (citations omitted). To support an officer's reasonable suspicion of criminal activity as a basis for an investigatory stop, he needs "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *United States v. Sokolow*, 490 U.S.1, 7 (1989)). However, "the greater the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing." *O'Malley*, 652 F.3d at 670.

Plaintiffs contend that Defendants did not have reasonable suspicion justifying the investigatory stop because the officers had information only from anonymous 911

callers, Plaintiffs' activity was legal, and Plaintiffs did not attempt to flee the scene upon seeing the officers.  Although these facts, taken alone, may point to the conclusion that the officers lacked reasonable suspicion, "the whole picture," *Cortez*, 449 U.S. at 417, certainly gave rise to the officers' reasonable suspicion "using a common sense approach," *Clay*, 181 F. App'x at 544, that Plaintiffs were engaging in, or intended, criminal activity.  Defendants responded to at least six (and possibly more) 911 calls from concerned citizens.  Upon arriving at the scene, Defendants encountered two heavily armed individuals outside of a hospital.  When asked what they were doing Baker elusively (if not defiantly) answered "walking."[6]  Not only did the officers have reasonable suspicion to believe that Plaintiffs were engaging in criminal activity, but they also had reasonable suspicion to believe that Plaintiffs *may have been about to commit a crime*.  Moments *before* James Eagan Holmes entered the movie theater in Aurora, Colorado, he had not yet killed twelve people and injured seventy others.  Similarly, *before* Adam Lanza entered Sandy Hook Elementary School he had not yet fatally shot twenty children and six adults.  Reasonable officers may well have been concerned with what Plaintiffs would do next, not what they had already done, or were doing.  "[A] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity."  *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (citations omitted).  As the Sixth Circuit has explained, "the constitutional question is whether the officers had reasonable suspicion of a crime, not whether a crime occurred.  Otherwise,

---

[6] "[T]he whole picture," *Cortez*, 449 U.S. at 417, looked suspicious.  In fact, one 911 caller reported, "two gentlemen walking on side of the road with large guns" and asked "if that was normal[?]"

all failed investigatory stops would lead to successful § 1983 actions." *Embody v. Ward*, 695 F.3d 577, 581 (6th Cir. 2012).

*Banks v. Gallagher*, No. 3:08–CV–1110, 2011 WL 718632, at *4 (M.D. Pa. Feb. 22, 2011), is instructive.  The *Banks* court held that the defendant police officers had reasonable suspicion to temporarily detain armed men, some who were openly carrying firearms, and some who were carrying concealed weapons, after they entered a family diner, refused to explain their purpose, and began recording the event.  There, the court explained:

> Despite the fact that carrying guns may be perfectly legal in Pennsylvania, a dozen armed men all appearing at an otherwise sleepy family establishment, at the same time, may create reasonable suspicion.  Context matters.  Several men donning ski masks do not give rise to reasonable suspicion when entering a ski lodge; yet grounds for such suspicion are amply present were these same men entering a jewelry store.  Likewise, a dozen men openly carrying weapons may not raise so much as an eyebrow at an NRA convention; however, reasonable suspicion may be present were they to enter a Sunday church service.  Likewise, a number of armed men appearing together can create reasonable suspicion where one might not.

*Id.*  Here too, the officers had the requisite reasonable suspicion of criminal activity to perform an investigatory stop.

Plaintiffs also argue that their activity was not particularly unusual because twenty-five members of Michigan Open Carry[7] had recently marched in the Sterling Heights Memorial Day parade.  This argument, too, is off target.  Here, Plaintiffs never

---

[7] According to their website, the objectives of Michigan Open Carry, Inc., a non-profit organization are:  "to educate and desensitize the public and members of the law enforcement community about the legality of the open carry of a handgun in public," "to exercise a natural right to self defense using the most efficient and common tool, a handgun," "to demonstrate to the public at large that gun owners are one of the most lawful segments of society and they have nothing to fear from the lawful carry of a firearm," and "to protect our right to self-defense."  http://www. michiganopencarry. org/ (last visited August 7, 2014) (URL contains spaces).

informed the city of their planned actions nor did they have any signs, pamphlets, or other political communications indicating their intent to demonstrate or educate the public or police.  *See Embody*, 695 at 581 (6th Cir. 2012) ("Having worked hard to appear suspicious in an armed-and-loaded visit to the park, [Plaintiff] cannot cry foul after park rangers, to say nothing of passers-by, took the bait.").  Again, context matters. Memorial Day is a national holiday honoring Americans who died while serving in the military.  The City of Sterling Heights accepts "applications from veterans groups, school marching bands, scouting groups, elected officials and other organizations interested in marching" in the annual Memorial Day Parade.[8]  Plaintiffs' activity in this case is not in any sensible way comparable to marching with rifles in an organized public parade on a day that commemorates the many sacrifices of military service.  Based on the totality of the circumstances, Defendants' decision to stop and temporarily detain Plaintiffs was objectively reasonable.

Having established that the officers had a proper basis to stop Plaintiffs, the court must now consider whether the degree of intrusion was reasonable.  Plaintiffs contend that Defendants' seizure of their firearms was not reasonable because Plaintiffs indicated that they were not going to touch their firearms, they did not attempt to flee the scene upon seeing the police approach, and they did not pose an immediate threat to the safety of the officers.  (Dkt. # 20, Pg. ID 211.)  Again, Plaintiffs' argument misses the mark.  The officers had no obligation to take Plaintiffs at their word when they said they

---

[8] http://sterling-heights. net/bins/site/templates/default.asp?area_2 =pages/events/parade/memorialdayparade.dat&area_1=pages/nav/events/events.dat& area_3 =0.dat&area_0 =0.dat&area_8 =0.dat&objectid =104903130&ml_index =15&NC=2535X (last visited August 11, 2014) (rendering of URL contains spaces)

would not touch their weapons.  Similarly, the officers were entitled to take precautionary measures.  For example, it is well-established that law enforcement may temporarily seize weapons during a *Terry* stop.  *United States v. Isham*, 501 F.2d 989, 991 (6th Cir. 1974) (holding that the seizure of a rifle from a car was reasonable both under the public-safety rationale and under *Terry's* self-protection rationale even though the defendant already had been handcuffed); *United States v. Southern*, No. 99-1736, 2000 WL 1769633, at *7 (6th Cir. Nov. 16, 2000) ("[T]he officers had cause to temporarily seize the pistols [found in plain view] for safety reasons (based upon reasonable suspicion) before they even read the serial numbers" and discovered the pistols were stolen property); *Burgess v. Wallingford*, 2013 WL 4494481, at *4 (D. Conn. May 15, 2013) ("Weapons cause unique concerns for the safety of the public and the police.  Under these circumstances, the police officers had reasonable suspicion to make an investigatory stop and to seize plaintiff's weapon and ammunition for their own safety while they determined whether an arrest was appropriate.")  Here, Plaintiffs were heavily armed, walking down a public sidewalk in a densely populated city, and did not display their alleged intent to educate the public and law enforcement about openly carrying firearms.  Given the circumstances, Defendants' temporary seizure of Plaintiffs' firearms was objectively reasonable.

Plaintiffs also argue that Defendants did not use the least intrusive means in determining Plaintiffs' identity because the officers "searched the Plaintiffs looking for their identification first and without asking for the Plaintiffs to identify themselves."  (Dkt. #20-1, Pg. ID 211.)  But the court has already established that the officers had probable cause to search Plaintiffs, and thus they necessarily had reasonable suspicion to do so.

16

*See United States v. Payne*, 181 F.3d 781, 790 (6th Cir. 1999) ("Courts analyzing searches under the reasonable suspicion standard use the same factors but require a less demanding showing than when applying a probable cause standard."). Moreover, as indicated earlier, the law clearly establishes that when circumstances warrant precautions such as handcuffing the detained person, officers do not exceed the bounds of a *Terry* stop by doing so. *See, e.g., Turner v. Viviano*, 04-CV-70509-DT, 2005 WL 1678895, at *6 (E.D. Mich. July 15, 2005). The scope of the search was "strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (citations omitted).

Defendants did not violate any of Plaintiffs' clearly established rights under the Fourth Amendment and are therefore entitled to qualified immunity on this claim.

## B. Second Amendment

Like their Fourth Amendment claims, Plaintiffs' arguments under the Second Amendment are difficult to ascertain. In their response, Plaintiffs argue that, "[w]hen Officer Schwarb and Phillips removed the firearms from Plaintiffs, without probable cause let alone reasonable suspicion that a crime had been committed, Defendants deprived Plaintiffs of their constitutional right [under the Second Amendment] to 'keep and bear arms.'" (Dkt. # 20, Pg. ID 218.) It is unclear if Plaintiffs are arguing that the officers violated their alleged right to openly carry a firearm or their alleged right to bear arms for the purpose of self-defense. Either way their claim fails.

Plaintiffs emphasize that under Michigan law, they have a right to openly carry their firearms. Plaintiffs primarily rely on an October 2012 Michigan State Police Legal Update which states:

17

> In Michigan, it is legal for a person to carry a firearm in public as long as the person is carrying the firearm with lawful intent and the firearm is not concealed. [No law] states that it is legal to openly carry a firearm. It is legal because there is no Michigan law that prohibits it; however, Michigan law limits the premises on which a person may carry a firearm.

But "§ 1983 claims are designed to vindicate federal law, not state law." *Embody*, 695 F.3d at 581. Plaintiffs' assertion that Defendants violated Michigan law by seizing their weapons is irrelevant for § 1983 purposes. The "[m]ere violation of a state statute does not infringe the federal Constitution." *Snowden v. Hughes*, 321 U.S. 1, 11 (1944). Further, the issue does not implicate a statute, but rather a Michigan State Police Legal Update.

To the extent that Plaintiffs argue that Defendants violated their Second Amendment right to keep and bear arms for the purpose of self-defense, qualified immunity applies because even if a right of Plaintiffs' was violated, that right was not clearly established. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court stuck down a District of Columbia law that effectively banned the possession of handguns in the home and held that the Second Amendment protects an individual right "to possess and carry weapons in case of confrontation." *Id.* at 628–32. More recently, in *McDonald v. Chicago*, 561 U.S. 742, (2010), the Court held the Second Amendment right recognized in *Heller* is "fully applicable to the States." However, "[l]ike most rights, the Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 570. Even after *McDonald*, the application of the Second Amendment (and specifically the right to bear arms for the purpose of self-defense) outside of the home, is unsettled. *See Drake v. Filko*, 724 F.3d 426, 430 (3d Cir. 2013) ("It remains unsettled

18

whether the individual right to bear arms for the purpose of self-defense extends beyond the home."); *Gonzalez v. Village of West Milwaukee*, 671 F.3d 649, 659 (7th Cir. 2012) (referring to this issue as "unsettled territory"); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (noting that "[t]here may or may not be a Second Amendment right in some places beyond the home," and that "[o]n the question of *Heller's* applicability outside the home environment, we think it prudent to await direction from the Court itself"). As such, the right Plaintiffs say Defendants violated—the right to bear arms for the purpose of self-defense outside the home—is not clearly established under the Second Amendment. *See Saucier*, 533 U.S. at 201.[9]

Defendants are entitled to qualified immunity on Plaintiffs' Second Amendment § 1983 claim.

## C. First Amendment

Yet again, the precise nature of Plaintiffs' argument under the First Amendment is not entirely clear. In the complaint, Plaintiffs allege that Defendants violated their free speech rights including their "right to core political speech" and their "right to symbolic speech." (Dkt. # 15, Pg. ID 87–88.) In their response, Plaintiffs do not mention "political speech" and thus this argument is forfeited. Plaintiffs do discuss "symbolic speech" and argue that "Plaintiffs' First Amendment [free speech] rights were infringed by the officers

---

[9] Further, to the extent that Plaintiffs argue that the Second Amendment encompasses the related, but distinct, right to openly carry a firearm, this supposed right is not clearly established either. *See Burgess*, 2014 WL 2609632, at *2 (citation omitted) ("[T]he protection that Burgess claims he deserves under the Second Amendment—the right to carry a firearm openly outside the home—is not clearly established law.").

when their walk was interrupted and they were detained for promoting open carry." (Dkt. # 20-1, Pg. ID 220.)  Plaintiffs' argument lacks merit.

"The First Amendment protects not only the expression of ideas through printed or spoken words, but also symbolic speech—nonverbal 'activity . . . sufficiently imbued with elements of communication.'"  *Roulette v. City of Seattle*, 97 F.3d 300, 302-03 (9th Cir. 1996) (quoting *Spence v. Washington,* 418 U.S. 405, 409 (1974)).  In addressing when conduct constitutes speech for First Amendment purposes, a court asks whether "[a]n intent to convey a particularized message was present, and [whether] in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."  *Spence v. Washington*, 418 U.S. 405, 410–11 (1974).  In the context of conduct related to firearms, *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003), noted that "a gun protestor burning a gun may be engaged in expressive conduct.  So might a gun supporter waving a gun at an anti-gun control rally."  *Id.* at 1190.  However, "[t]ypically a person possessing a gun has no intent to convey a particular message, nor is any particular message likely to be understood by those who view it."  *Id; see also Burgess*, 2013 WL 4494481, at *9 ("Carrying a weapon alone is generally not associated with expression.").

> *Burgess* is instructive:
>
> If reasonable officers could disagree regarding whether plaintiff's conduct of wearing an unconcealed weapon with ammunition and wearing a shirt referencing the right to bear arms was symbolic speech protected under the First Amendment, the defendant officers are entitled to qualified immunity on plaintiff's First Amendment claim.  Here, given the circumstances that led to the officers' encounter with Burgess on the evening in question and what they encountered on the scene, the Court finds that reasonable officers could disagree whether or not there was a great likelihood of plaintiff's visible weapon and his shirt conveying a message to those who viewed it.

20

*Id.*  In the present case too, Plaintiffs' conduct cannot be considered symbolic speech for purposes of First Amendment protection.  Unlike the scenario in *Burgess*, here, the Plaintiffs gave *no* visual cues to provide context for their actions.  Thus, it is even less likely that those who viewed Plaintiffs' conduct would understand their intended message.  Plaintiffs emphasize that they eventually informed the officers of their intent to exercise their First and Second Amendment rights.  Yet the relevant inquiry is whether those who viewed the conduct would likely understand the "message" Plaintiffs were trying to convey, or that there was a message of any sort involved.  *Spence*, 418 U.S. at 410–11.  Based upon the numerous emergency calls the City of Sterling Heights received from concerned citizens, it seems clear that these random observers did not apprehend that Plaintiffs were engaged in any such thing.  Instead of perceiving Plaintiffs as open carry activists demonstrating their First or Second Amendment rights, passer-byes were simply alarmed and concerned for their safety and that of their community.  Plaintiffs' conduct does not constitute speech protected by the First Amendment.

Defendants are entitled to qualified immunity on Plaintiffs' First Amendment § 1983 claim.

## IV.  CONCLUSION

Plaintiffs have not met their burden because they have not shown that Defendants are not entitled to qualified immunity with respect to their § 1983 claims under the Fourth, Second, and First Amendments.  *Sheets*, 287 F.3d at 586.  Accordingly,

21

IT IS ORDERED that Defendants' motion for summary judgment (Dkt. # 16) is

GRANTED.

A separate judgment will issue.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  August 19, 2014

 I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, August 19, 2014, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
 (313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\14-10784.BAKER.MSJ.draft4.rljr.wpd